## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| CYNTHIA BRONSON, | ) | | |
| | ) | | |
| Plaintiff, | ) | Civil Action No. 12-1793 | |
| | ) | | |
| v. | ) | Judge Nora Barry Fischer | |
| | ) | | |
| CAROLYN W. COLVIN, | ) | | |
| Acting Commissioner of Social Security, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## MEMORANDUM OPINION

### I.      INTRODUCTION

Cynthia Bronson ("Bronson") brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying her application for supplemental security income ("SSI") benefits

under Title XVI of the Social Security Act ("Act") [42 U.S.C. §§ 1381-1383f].  The matter is

presently before the Court on cross-motions for summary judgment filed by the parties pursuant

to Federal Rule of Civil Procedure 56.  (Docket Nos. 8 & 13).  For the reasons that follow,

Bronson's motion for summary judgment (*Docket No. 8*) will be denied, the Commissioner's

motion for summary judgment (*Docket No. 13*) will be granted, and the Commissioner's decision

will be affirmed.

### II.      PROCEDURAL HISTORY

Bronson protectively applied for SSI benefits on February 19, 2010, alleging that she had

become "disabled" on March 7, 2007.  (R. at 9, 124, 141).  Pennsylvania's Bureau of Disability

Determination ("Bureau") denied the application on April 29, 2010.  (R. at 9, 71).  Bronson

responded on June 3, 2010, by filing a timely request for an administrative hearing.  (R. at 76-

78).  On May 13, 2011, a hearing was held in Latrobe, Pennsylvania, before Administrative Law

Judge ("ALJ") Barbara J. Artuso.  (R. at 20).  Bronson, who was represented by counsel,

appeared and testified at the hearing.  (R. at 25-41).  Mitchell A. Schmidt ("Schmidt"), an

impartial vocational expert, also testified at the hearing.  (R. at 41-52).  In a decision dated July

8, 2011, the ALJ determined that Bronson was not "disabled" within the meaning of the Act.  (R.

at 6-17).

On August 31, 2011, Bronson sought administrative review of the ALJ's decision by

filing a request for review with the Appeals Council.  (R. at 113-114).  The Appeals Council

denied the request for review on October 26, 2012, thereby making the ALJ's decision the "final

decision" of the Commissioner in this case.  (R. at 1).  Bronson commenced this action on

December 7, 2012, seeking judicial review of the Commissioner's decision.  (Docket Nos. 1-3).

Bronson and the Commissioner filed motions for summary judgment on March 6, 2013, and May

9, 2013, respectively.  (Docket Nos. 8 & 13).  Those motions are the subject of this

memorandum opinion.

## III.    STANDARD OF REVIEW

This Court's review is plenary with respect to all questions of law.  *Schaudeck v.*

*Commissioner of Social Security Administration*, 181 F.3d 429, 431 (3d Cir. 1999).  With respect

to factual issues, judicial review is limited to determining whether the Commissioner's decision

is "supported by substantial evidence."  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46

(3d Cir. 1994).  The Court may not undertake a *de novo* review of the Commissioner's decision

or re-weigh the evidence of record.  *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-

1191 (3d Cir. 1986).  Congress has clearly expressed its intention that "[t]he findings of the

Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

conclusive." 42 U.S.C. § 405(g). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)(internal quotation marks omitted). As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this Court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him [or her] from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Secretary of Health & Human Services*, 841 F.2d 57, 59 (3d Cir. 1988); *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant is considered to be unable to engage in substantial gainful activity "only if his [or her] physical or mental impairment or impairments are of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To support his or her ultimate findings, an administrative law judge must do more than simply state factual conclusions. He or she must make specific findings of fact. *Stewart v. Secretary of Health, Education & Welfare*, 714 F.2d 287, 290 (3d Cir. 1983). The administrative law judge must consider all medical evidence contained in the record and provide adequate

explanations for disregarding or rejecting evidence. *Weir on Behalf of Weir v. Heckler*, 734 F.2d

955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its legislatively-delegated

rulemaking authority, has promulgated a five-step sequential evaluation process for the purpose

of determining whether a claimant is "disabled" within the meaning of the Act. The United

States Supreme Court has summarized this process by stating as follows:

> If at any step a finding of disability or non-disability can be made, the SSA will
> not review the claim further. At the first step, the agency will find non-disability
> unless the claimant shows that he is not working at a "substantial gainful
> activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find
> non-disability unless the claimant shows that he has a "severe impairment,"
> defined as "any impairment or combination of impairments which significantly
> limits [the claimant's] physical or mental ability to do basic work activities." §§
> 404.1520(c), 416.920(c). At step three, the agency determines whether the
> impairment which enabled the claimant to survive step two is on the list of
> impairments presumed severe enough to render one disabled; if so, the claimant
> qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the
> list, the inquiry proceeds to step four, at which the SSA assesses whether the
> claimant can do his previous work; unless he shows that he cannot, he is
> determined not to be disabled. If the claimant survives the fourth stage, the fifth,
> and final, step requires the SSA to consider so-called "vocational factors" (the
> claimant's age, education, and past work experience), and to determine whether
> the claimant is capable of performing other jobs existing in significant numbers in
> the national economy. §§ 404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003)(footnotes

omitted). Factual findings pertaining to all steps of the sequential evaluation process are subject

to judicial review under the "substantial evidence" standard. *McCrea v. Commissioner of Social

Security*, 370 F.3d 357, 360-361 (3d Cir. 2004).

In an action in which review of an administrative determination is sought, the agency's

decision cannot be affirmed on a ground other than that actually relied upon by the agency in

making its decision. In *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 67

S.Ct. 1575, 91 L.Ed. 1995 (1947), the Supreme Court explained:

> When the case was first here, we emphasized a simple but fundamental rule of administrative law. That rule is to the effect that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency. If those grounds are inadequate or improper, the court is powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis. To do so would propel the court into the domain which Congress has set aside exclusively for the administrative agency.

*Chenery Corp.*, 332 U.S. at 196. The United States Court of Appeals for the Third Circuit has recognized the applicability of this rule in the Social Security disability context. *Fargnoli v. Massanari*, 247 F.3d 34, 44, n. 7 (3d Cir. 2001). Thus, the Court's review is limited to the four corners of the ALJ's decision. *Cefalu v. Barnhart*, 387 F.Supp.2d 486, 491 (W.D.Pa. 2005).

## IV.    THE ALJ'S DECISION

In her decision, the ALJ determined that Bronson had not engaged in substantial gainful activity subsequent to the date of her application. (R. at 11). Bronson was found to be suffering from degenerative disc disease of the lumbar spine, myofascial pain syndrome, degenerative joint disease of the knee, obesity, a panic disorder without agoraphobia, and a depressive disorder. (R. at 11-13). Her degenerative disc disease, myofascial pain syndrome, degenerative joint disease and obesity were deemed to be "severe" under the Commissioner's regulations. (R. at 11); 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c). The ALJ concluded that Bronson's impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 13).

In accordance with 20 C.F.R. § 416.945, the ALJ assessed Bronson's "residual functional capacity"[1] as follows:

---

[1] The term "residual functional capacity" is defined as "that which an individual is still able to do despite the limitations caused by his or her impairments." *Hartranft v. Apfel*, 181 F.3d 358, 359, n. 1 (3d Cir.

>After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light light work as defined in 20 CFR 416.967(b), except that she could stand and walk 2 hours and sit 6 hours in an 8-hour day and would need to alternate between sitting and standing every 30 minutes, could never climb ladders, ropes, and scaffolds, could occasionally climb ramps/stairs, crouch, and crawl, and could frequently balance, stoop, and kneel.

(R. at 13). Bronson had "past relevant work"[2] experience as a cashier. (R. at 45-46). Schmidt testified that an individual with the limitations contained within the ALJ's residual functional capacity assessment would be precluded from performing the duties of Bronson's previous cashier position. (R. at 46-47). Therefore, it was determined that Bronson could not return to her past relevant work. (R. at 16).

Bronson was born on May 4, 1971, making her thirty-eight years old on her application date and forty years old on the date of the ALJ's decision. (R. at 16, 26, 124). She was classified as a "younger person" under the Commissioner's regulations. 20 C.F.R. § 416.963(c). She had a high school education[3] and an ability to communicate in English. (R. at 16, 26); 20 C.F.R. § 416.964(b)(4)-(5). Given the applicable residual functional capacity and vocational assessments, the ALJ concluded that Bronson could work as a plastic assembler, garment sorter, surveillance systems monitor or cuff folder. (R. at 16-17). Schmidt's testimony established that

---

1999)(parentheses omitted), citing 20 C.F.R. § 404.1545(a). The same residual functional capacity assessment is used at the fourth and fifth steps of the sequential evaluation process. 20 C.F.R. §§ 404.1545(a)(5)(i)-(ii), 416.945(a)(5)(i)-(ii).

[2] "Past relevant work" is defined as "substantial gainful activity" performed by a claimant within the last fifteen years that lasted long enough for him or her to learn how to do it. 20 C.F.R. §§ 404.1560(b)(1), 416.960(b)(1). The Commissioner has promulgated comprehensive regulations governing the determination as to whether a claimant's work activity constitutes "substantial gainful activity." 20 C.F.R. §§ 404.1571-404.1576, 416.971-416.976. In addition to working as a cashier, Bronson previously worked as a factory worker, paper deliverer and tax preparer. (R. at 147). In response to the ALJ's first hypothetical question, Schmidt testified that the described individual could work as a tax preparer. (R. at 47). The ALJ's subsequent residual functional capacity finding was based on her second hypothetical question, which permitted Bronson to alternate between sitting and standing every thirty minutes. (R. at 13, 48). It is not clear from Schmidt's testimony whether he believed the individual described in the second hypothetical question to be capable of working as a tax preparer. (R. at 46-49). In any event, it appears that the ALJ considered Bronson's cashier position to be the only one constituting "substantial gainful activity." (R. at 45-47).

[3] Bronson completed two years of college after graduating from high school. (R. at 26, 146).

those jobs existed in the national economy for purposes of 42 U.S.C. § 1382c(a)(3)(B).[4]  (R. at 47-48).

## V.    THE EVIDENTIARY RECORD

Bronson worked at a nursing home when she was in her early twenties.  (R. at 44).  That was apparently the only full-time job that she has ever held.  (R. at 44).  From February 1992 through August 1999, she worked twelve hours per week as a cashier for a video store.  (R. at 147).  Schmidt classified that position as an "unskilled"[5] job at the "light"[6] level of exertion.  (R. at 45-46).  Bronson attended college while working as a cashier.  She completed her second year of college on May 6, 1998.  (R. at 146).

For most of 2001, Bronson performed part-time work at a factory.  (R. at 147).  In that position, she packaged medical products.  (R. at 43-44).  Schmidt testified that individuals performing the duties of similar positions in the national economy typically engaged in "medium"[7] work activities.  (R. at 46).  Bronson stated that injuries to her ankles had caused her to leave her position at the factory.  (R. at 44-45).  In February 2002, she started to work as a newspaper deliverer for the *Blairsville Dispatch*.  (R. at 147).  Bronson testified that her deliverer

---

[4] At the fifth step of the sequential evaluation process, "the Commissioner bears the burden of proving that, considering the claimant's residual functional capacity, age, education, and past work experience, [he or] she can perform work that exists in significant numbers in the regional or national economy." *Boone v. Barnhart*, 353 F.3d 203, 205 (3d Cir. 2003).  This burden is commonly satisfied by means of vocational expert testimony. *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

[5] "Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.  The job may or may not require considerable strength.  For example, [the Commissioner] consider[s] jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed.  A person does not gain work skills by doing unskilled jobs."  20 C.F.R. §§ 404.1568(a), 416.968(a).

[6] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities."  20 C.F.R. §§ 404.1567(b), 416.967(b).

[7] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. §§ 404.1567(c), 416.967(c).

position had been a part-time job that she had performed "with help." (R. at 44). The record indicates that she spent only six hours per week performing the duties of that job. (R. at 147). Bronson stopped working for the *Blairsville Dispatch* in March 2003. (R. at 147).

In December 2006, Bronson commenced duties as a tax preparer for H&R Block. (R. at 147). She spent sixteen hours per week working in that capacity. (R. at 147). Schmidt classified Bronson's tax preparer position as a "semi-skilled"[8] job at the "sedentary"[9] level of exertion. (R. at 46). Bronson suffered a back injury on March 7, 2007.[10] (R. at 224-234). An x-ray of her lumbar spine detected no acute skeletal findings or abnormalities. (R. at 204, 234). Dr. Ronald Smith, a physician affiliated with Latrobe Area Hospital, determined that Bronson had suffered a lumbosacral back strain with sciatica. (R. at 230-233). The injury caused Bronson to leave her job at H&R Block. (R. at 27).

Schmidt testified that Bronson's time at H&R Block had lasted long enough for her to acquire the skills associated with her tax preparer position. (R. at 46). In response to the ALJ's first hypothetical question, Schmidt stated that the individual described by the ALJ could work as a tax preparer. (R. at 47). The first hypothetical question did not include the accommodation permitting Bronson to alternate between sitting and standing every thirty minutes. (R. at 13, 46-47). When the ALJ included that accommodation within her second hypothetical question, Schmidt testified that the described individual could work as a plastic assembler, garment sorter,

_____

[8] "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." 20 C.F.R. §§ 404.1568(b), 416.968(b).

[9] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. §§ 404.1567(a), 416.967(a).

[10] It is not entirely clear how Bronson injured her back. In a treatment note dated January 4, 2008, Dr. Subrata P. Barua stated that "no definite accident" had caused Bronson's back impairment. (R. at 241). When questioned by Schmidt at the hearing, Bronson testified that she had not injured her back while working at H&R Block. (R. at 42).

surveillance systems monitor or cuff folder. (R. at 46-49). He described those positions as "posturally immaterial" jobs at which an individual could be productive regardless of whether he or she was sitting or standing. (R. at 49). It is not clear from the record whether the accommodation providing for a sit/stand option would preclude an individual from working as a tax preparer. (R. at 45-52). That issue is inconsequential, since the ALJ's finding at the fourth step of the sequential evaluation process was favorable to Bronson. (R. at 16).

On December 21, 2007, Bronson felt a sharp pain in her back while trying to tie her shoes. (R. at 220, 254). The sudden onset of pain caused her to seek treatment at Latrobe Area Hospital. (R. at 218-223). While traveling to the emergency room, Bronson suffered a panic attack. (R. at 220). It was later determined that her pain was not attributable to gastrointestinal or gynecological impairments. (R. at 220). The attending medical personnel noted that while Bronson's back pain was "worse with movement," she had "[n]o trouble walking." (R. at 220). They concluded that the pain had been caused by a strain of the muscles or ligaments supporting Bronson's spine, and that her symptoms would most likely improve within two to three days. (R. at 222). In the meantime, Bronson was instructed not to sit, drive or stand in one place for more than thirty minutes at a time. (R. at 222). A narcotic pain medication was prescribed to alleviate her symptoms. (R. at 222).

Dr. Subrata P. Barua, an orthopedic specialist, examined Bronson on January 4, 2008. (R. at 241). He observed that she had "increased lumbar lardosis and marked limitation of back motion because of the pain." (R. at 241). A magnetic resonance imaging ("MRI") scan performed on January 8, 2008, revealed that Bronson had degenerative disc disease, degenerative joint disease and mild spondylolisthesis in her lumbar spine. (R. at 237-238, 241). Three days

later, Dr. Barua noted that Bronson did not have neuroformainal narrowing or disc herniations. (R. at 241). He reported that she was "starting to get better." (R. at 241).

On January 14, 2008, Bronson began a course of physical therapy at In-Sync Rehabilitation Services, Inc. ("In-Sync"). (R. at 254). Robert K. Carr ("Carr"), a physical therapist for In-Sync, placed Bronson on a home exercise program. (R. at 255). After the initial evaluation with Carr, Bronson was treated by physical therapist Les Brantley ("Brantley"). (R. at 252-253). Following a full week of physical therapy, Bronson had a "very good day" involving "no pain" and "a lot of shopping and walking." (R. at 252). Bronson reported on January 28, 2008, that she was "feeling great" and taking daily walks. (R. at 249, 252). She further stated that she had stopped taking her daily pain medication. (R. at 249). Bronson's course of physical therapy continued into February 2008. (R. at 246, 251). Her treatment included an aquatic exercise program designed to increase the strength of her lower extremities and trunk. (R. at 247). On February 8, 2008, Carr observed that Bronson was "reporting a very low level of pain" and "doing much better functionally." (R. at 247).

Martha McMichael ("McMichael"), a non-examining adjudicator, determined on March 6, 2008, that Bronson was physically capable of performing an unrestricted range of "light" work activities. (R. at 134-140). The next day, Dr. Sharon Becker Tarter reported that Bronson had no medically determinable mental impairment. (R. at 263). Those opinions were provided in connection with an earlier application for SSI benefits filed by Bronson. (R. at 115). The Bureau denied that application on March 13, 2008. (R. at 58).

During the summer of 2008, Bronson reinjured her back while transferring from a toilet. (R. at 284). Pain resulting from the injury made it difficult for her to sit, bend or walk. (R. at 284). On August 15, 2008, Bronson began a course of physical therapy at the Laurel Highlands

Health Center ("Laurel Highlands") in Latrobe, Pennsylvania. (R. at 284). Sonya J. Maskrey ("Maskrey"), a treating physical therapist, reported on August 25, 2008, that Bronson had experienced "functional improvement with mobility" and was "able to increase distance with walking." (R. at 288). The therapy sessions continued into the middle of September 2008. (R. at 289-291). On September 11, 2008, Maskrey noted that physical therapy had helped Bronson to "feel stronger with improved mobility." (R. at 291).

Bronson retuned to Laurel Highlands on October 7, 2008, complaining of left-sided pain in her lower back. (R. at 292). She was apparently experiencing "specific difficulty with walking, standing, prolonged sitting and lying prone." (R. at 292). Bronson was placed on a new aquatic exercise program. (R. at 293). Two days later, Maskrey reported that Bronson was "feeling pretty good" and attending "aquatic aerobic exercises" at a local Young Men's Christian Association ("YMCA"). (R. at 294). Bronson was advised to limit her exercises outside of the therapy sessions in order to facilitate the assessment of her progress through therapeutic protocols. (R. at 294). She canceled two sessions in October 2008 and failed to appear for a session scheduled for November 6, 2008. (R. at 295, 297).

On December 17, 2008, Bronson slipped on a patch of mud and twisted her left knee. (R. at 456). X-rays taken after the incident revealed that her injury was mild. (R. at 456). Dr. A. Roger Wigle prescribed Percocet to alleviate Bronson's knee pain. (R. at 456). He also provided her with a prescription for physical therapy at Laurel Highlands. (R. at 456). A hinged knee sleeve was also provided to assure Bronson's comfort. (R. at 456). Although Bronson was advised to use crutches until she felt comfortable walking with the knee brace, Dr. Wigle placed no specific restrictions on her physical activities. (R. at 456).

Bronson returned to Laurel Highlands on December 23, 2008. (R. at 298-299, 452). She complained of difficulty with walking, standing, climbing stairs and transferring. (R. at 298, 452). Maskrey observed that Bronson was ambulating with a straight cane in her left upper extremity.[11] (R. at 298, 452). Aquatic therapy was initiated three days later. (R. at 300). After only one week of treatment, Bronson was "feeling much better" and decreasing her use of the straight cane. (R. at 301). As of January 8, 2009, she was "no longer using a straight cane for ambulation." (R. at 303, 453). Nonetheless, Bronson continued to experience difficulties while descending flights of stairs. (R. at 303, 453). During a follow-up appointment with Dr. Wigle on January 12, 2009, Bronson acknowledged that physical therapy had "helped considerably." (R. at 456). Six additional sessions were authorized. (R. at 304-305, 456). Bronson was discharged from formal physical therapy services on January 26, 2009. (R. at 306). At that time, she reported "improved mobility" with walking, transferring and climbing stairs. (R. at 307, 454). Maskrey noted that Bronson was "using her cane only for home stair negotiation," since the steps in her home were steep and narrow. (R. at 307, 454).

The pain in Bronson's lower back increased during the summer of 2009, making it difficult for her to sit, stand, walk, climb stairs, and dress herself. (R. at 308). She sought follow-up therapy at Laurel Highlands on August 3, 2009. (R. at 308). Maskrey observed that while Bronson was using a cane for transfers, she did not need it for ambulation. (R. at 308). It was further noted that Bronson was ambulating "with decreased step length and trunk rotation." (R. at 308). A new physical therapy program was initiated. (R. at 309). The prescribed treatment regimen included aquatic exercises, manual therapy, therapeutic exercises, neuromuscular reeducation activities, and a home exercise program. (R. at 309). Bronson's

---

[11] At the hearing, Bronson testified that she was right-handed. (R. at 26). Due to the injury to her left knee, Bronson apparently held the cane in her non-dominant hand. (R. at 298, 452).

symptoms gradually improved with treatment. (R. at 310). She temporarily aggravated her condition on August 13, 2009, by falling down a flight of stairs. (R. at 311). Four days later, however, physical therapist Paul L. Imbrogno ("Imbrogno") reported that Bronson had responded positively to her aquatic exercises and the manual therapy performed on her lower back. (R. at 313). Bronson's physical therapy sessions continued for another month. (R. at 314-318). On September 14, 2009, Maskrey stated that Bronson was "using her cane only for stairs and prolonged ambulation." (R. at 316). Maskrey also described improvements in Bronson's "functional mobility." (R. at 317). Three days later, Bronson was discharged from formal physical therapy services and advised to continue with her home exercise program. (R. at 318).

Bronson's symptoms flared up during the 2009 Christmas season. (R. at 34, 319). At the hearing, Bronson testified that she had started to support herself with a cane in December 2009. (R. at 34). She further stated that she was using her right hand, which was her dominant hand, to hold the cane. (R. at 26, 35). Nevertheless, Bronson acknowledged that she had decided to use the cane on her own, and that it had not been prescribed by a physician. (R. at 34). She asserted that the cane was being used only for "stability purposes." (R. at 35).

On January 7, 2010, Bronson went to Laurel Highlands for further treatment. (R. at 319-321). She reported that prolonged standing had exacerbated her symptoms. (R. at 319-320). Physical therapist Deborah A. Kowatch ("Kowatch") observed that Bronson was ambulating without the use of an assistive device. (R. at 319). At that time, Bronson was enrolled in a water aerobics class at the Ligonier YMCA. (R. at 319). Physical therapy performed over the next four weeks dramatically improved her symptoms. (R. at 321-324). Bronson was discharged from formal physical therapy services on February 4, 2010. (R. at 324). She was instructed to continue with her home exercise program and her aquatic exercises at the YMCA. (R. at 324).

Kowatch noted that, at the time of her discharge, Bronson continued to "report an increase in symptoms with prolonged sitting." (R. at 325).

Dr. Reynaldo M. Torio, a non-examining medical consultant, opined on April 16, 2010, that Bronson was physically capable of engaging in a range of "light" work activities involving only occasional climbing, crouching and crawling. (R. at 361-367). He stated that while Bronson could occasionally climb ramps, stairs and ladders, she should never climb ropes or scaffolds. (R. at 363). Dr. Torio asserted that Bronson could stand or walk for no more than two hours throughout the course of an eight-hour workday. (R. at 362). Bronson's subjective complaints were deemed to be only partially credible. (R. at 367). The Bureau denied Bronson's application for SSI benefits shortly after receiving Dr. Torio's consultative assessment. (R. at 9, 71).

Dr. Lindsey Groves performed a psychological evaluation of Bronson on April 25, 2011. (R. at 440-450). The "clinical interview" lasted for roughly forty-five minutes. (R. at 440, 443). After completing the evaluation, Dr. Groves reported that Bronson was suffering from a panic disorder without agoraphobia and a depressive disorder. (R. at 443). Dr. Groves indicated that Bronson was "fairly"[12] able to use judgment, deal with work-related stresses, function independently, behave in an emotionally stable manner, and relate predictably in social situations. (R. at 448-449). Bronson's remaining functional abilities were described as being "good."[13] (R. at 448-449). Dr. Groves opined that while Bronson was not mentally capable of maintaining a full-time job at the time of the evaluation, she would be able to work if her symptoms continued to improve. (R. at 442). Bronson was not interested in seeking formal

---

[12] In this context, the word "fair" was defined to mean that an individual's ability to function in a given area was "seriously limited" but "not precluded." (R. at 447).
[13] The word "good" was defined to mean that an individual's ability to function in a given area was "limited but satisfactory." (R. at 447).

mental health treatment, since her primary care physician had already provided her with a prescription for Paxil. (R. at 441, 448). Dr. Groves predicted that Bronson's impairments would necessitate two absences per month if she were to be employed on a full-time basis. (R. at 445). When asked to provide specific reasons for believing Bronson to be "disabled," Dr. Groves stated that Bronson "could not work due to physical back pain," and that her anxiety was "secondary to physical pain." (R. at 445).

Dr. Mark Abbott, a treating chiropractor, detailed Bronson's alleged physical abilities and limitations in a report dated May 6, 2011. (R. at 458-466). He asserted that while she could "continuously" lift objects weighing up to ten pounds and "frequently" lift objects weighing up to twenty pounds, she could "never" lift objects weighing more than twenty pounds. (R. at 461). Dr. Abbott further indicated that Bronson could stand or walk for only one hour, and sit or drive for only two hours, during the course of an eight-hour workday. (R. at 461). At the hearing, Bronson testified that she typically spent most of her time lying on a couch. (R. at 30). In response to a question posed by Bronson's counsel, Schmidt testified that no full-time jobs existed in the national economy for an individual who could not sit, stand or walk for a total of eight hours per workday.[14] (R. at 50).

## VI. DISCUSSION

Bronson raises three issues in support of her motion for summary judgment.[15] First, she argues that her obesity was not accounted for in the ALJ's findings at the third and fifth steps of

---

[14] The inquiry required under the Social Security Act does not account for any "reasonable accommodations" mandated by Title I of the Americans with Disabilities Act of 1990 [42 U.S.C. §§ 12111-12117]. *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 803, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999); *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 95 (3d Cir. 2007).

[15] Although Bronson purports to raise six distinct issues, there is a substantial amount of overlap among them. The third, fourth and fifth issues raised in Bronson's brief all relate to the ALJ's failure to include the mental limitations identified by Dr. Groves in the residual functional capacity assessment and corresponding hypothetical questions to Schmidt. (Docket No. 9 at 3-4). The sixth issue raised by Bronson constitutes a generic assertion that "[t]he ALJ's

the sequential evaluation process. (Docket No. 9 at 3). Second, Bronson maintains that adverse credibility determinations were made without an adequate explanation. (*Id.*). Finally, she contends that the mental limitations found by Dr. Groves should have been reflected in the ALJ's residual functional capacity assessment and corresponding hypothetical questions to Schmidt. (*Id.* at 304). These issues will be addressed in sequential order.

The Listing of Impairments describes impairments which render a claimant *per se* disabled without regard to his or her age, educational background, or past work experience. *Bowen v. Yuckert*, 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987); *Knepp v. Apfel*, 204 F.3d 78, 85 (3d Cir. 2000). In order to qualify as *per se* disabled at the third step of the sequential evaluation process, a claimant must demonstrate that his or her impairment (or combination of impairments) either "matches" a Listing or is "equivalent" to a Listing. *Sullivan v. Zebley*, 493 U.S. 521, 530-531, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). An impairment "matches" a Listing only if it satisfies *all* of the relevant medical criteria. *Id.* at 530. An impairment is "equivalent" to a Listed Impairment only if it is supported by medical findings equal in severity to *all* of the criteria applicable to the most similar Listing. *Id.* at 531. The claimant bears the burden of presenting evidence in support of his or her allegation of *per se* disability. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992).

Where a claimant's obesity is recognized as a "severe" impairment, its effect on his or her ability to work must be considered at the third, fourth and fifth steps of the analysis. *Diaz v. Commissioner of Social Security*, 577 F.3d 500, 504-505 (3d Cir. 2009). Bronson asserts that the ALJ failed to consider the effects of her obesity under Listings 14.09A and 14.09D. (Docket No. 9 at 17). The relevant impairments are described as follows:

---

decision is not based upon substantial evidence," which is the premise of *every* action commenced against the Commissioner by an unsuccessful claimant. (*Id.* at 4). In essence, Bronson raises only three issues.

14.09 *Inflammatory arthritis*. As described in 14.00D6. With:
A. Persistent inflammation or persistent deformity of:
1. One or more major peripheral weight-bearing joints resulting in the inability to ambulate effectively (as defined in 14.00C6); or
2. One or more major peripheral joints in each upper extremity resulting in the inability to perform fine and gross movements effectively (as defined in 14.00C7).

\* \* \*

D. Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
1. Limitation of activities of daily living.
2. Limitation in maintaining social functioning.
3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 14.09. Bronson's argument is based on language in Listing 1.00L recognizing that "[a]bnormal curvatures of the spine . . . can result in impaired ambulation . . . [and] adversely affect functioning in body systems other than the musculoskeletal system." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.00L.

In *Burnett v. Commissioner of Social Security Administration*, 220 F.3d 112, 119-120 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit held that an administrative law judge must explain his or her reasons for determining that a claimant is not *per se* disabled. The rule established in *Burnett*, however, did not require the ALJ to "use particular language or adhere to a particular format in conducting h[er] analysis." *Jones*, 364 F.3d at 505. Although the ALJ did not specifically mention Listings 1.00L, 14.09A and 14.09D, she expressly articulated findings sufficient to negate the arguments raised by Bronson in relation to those Listings.[16] In the portion of her decision discussing her step-three finding, the ALJ noted that

---

[16] The ALJ specifically discussed the Listings applicable to mental disorders in determining that Bronson's mental impairments were not "severe." (R. at 11-13). While the ALJ did not expressly mention Listings 1.00L, 14.09A and 14.09D, her statements about Bronson's back impairments suggest that those Listings were considered in any event. (R. at 13-14).

Bronson "had only subtle dextroscoliotic curvature maximal convexity at L4." (R. at 13).

Moving on to discuss Bronson's residual functional capacity, the ALJ observed that "there [wa]s

no evidence that [Bronson's] obesity ha[d] resulted in systemic manifestations affecting other

body systems, or that her obesity ha[d] affected her ability to sustain activity on a regular and

continuing basis during an eight-hour day, five-day week, or equivalent schedule." (R. at 14). It

is worth noting that, at the hearing, Bronson did not specifically assert that she was *per se*

disabled under a particular Listing. Under these circumstances, the ALJ's analysis concerning

Bronson's obesity was sufficient to satisfy the requirements of *Burnett*. *Poulos v. Commissioner*

*of Social Security*, 474 F.3d 88, 93 (3d Cir. 2007).

Bronson does not elaborate on her reasons for believing that she is *per se* disabled.

(Docket No. 9 at 17). Nonetheless, the record does not contain evidence supporting her

arguments pertaining to the relevant Listings. When questioned by the ALJ, Bronson testified

that she had no difficulty using her arms, hands and fingers. (R. at 31). Given her testimony,

Bronson cannot reasonably argue that she suffers from an "inability to perform fine and gross

movements effectively." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 14.09A(2). The

ambulatory difficulties referenced in Listing 14.09A(1) incorporate the definition found in

Listing 1.00B(2)(b)(1), which defines "[i]neffective ambulation" as "insufficient lower extremity

functioning . . . to permit independent ambulation without the use of a hand-held assistive

device(s) that limits the functioning of *both* upper extremities." 20 C.F.R. Part 404, Subpart P,

Appendix 1, Listing 1.00B(2)(b)(1)(emphasis added). In other words, "the inability to walk

without the use of a walker, *two* crutches or *two* canes" is what renders a claimant *per se*

disabled under Listing 14.09A(1). 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing

1.00B(2)(b)(2)(emphasis added). At various times, Bronson used a *single* cane for balance and

ambulation. (R. at 34-35, 298, 307-308, 316, 452, 454). There is nothing in the record which suggests that she needed *two* canes to ambulate at any point between the date of her application and the date of the ALJ's decision. Shortly after injuring her knee in December 2008, Bronson was advised to use crutches until she felt comfortable walking with her knee brace. (R. at 456). She did not use crutches long enough to satisfy the Act's twelve-month durational requirement. *Barnhart v. Walton*, 535 U.S. 212, 214-222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002). Bronson testified that she typically went swimming with her mother and a friend on a daily basis. (R. at 29). Therefore, her conclusory argument pertaining to Listing 14.09D is meritless. (Docket No. 9 at 17).

An administrative law judge "must give serious consideration to a claimant's subjective complaints of pain" whenever the record contains objective evidence of a medical condition that could reasonably be expected to cause pain. *Mason v. Shalala*, 994 F.2d 1058, 1067-1068 (3d Cir. 1993). The ALJ determined that while Bronson's medically determinable impairments "could reasonably be expected to cause the alleged symptoms," her "statements concerning the intensity, persistence and limiting effects" of those symptoms were not credible to the extent that they alleged the existence of functional limitations extending beyond those contained in the residual functional capacity finding. (R. at 14). Bronson takes issue with the ALJ's credibility assessment. (Docket No. 9 at 18-20).

A close examination of the record reveals that the ALJ properly considered Bronson's subjective complaints. Bronson testified that her back pain would worsen whenever she had to sit, stand or walk for extended periods of time. (R. at 27). The ALJ addressed Bronson's testimony by affording her the option to alternate between sitting and standing every thirty minutes. (R. at 13). This accommodation was provided even though Dr. Torio had previously

opined that Bronson did not need a sit/stand option. (R. at 362). Consequently, it is clear from the record that Bronson's subjective complaints were carefully evaluated. The ALJ was not required to credit those complaints in every respect. *Chandler v. Commissioner of Social Security*, 667 F.3d 356, 363 (3d Cir. 2011).

The ALJ concluded that Bronson could stand or walk for up to two hours, and sit for up to six hours, over the course of an eight-hour workday. (R. at 13). That conclusion was consistent with Dr. Torio's consultative assessment. (R. at 362). Bronson asserts that an inconsistency exists between the two-hour standing limitation and the accommodation permitting her to alternate between sitting and standing every thirty minutes. (Docket No. 9 at 18). While the ALJ's language may seem to be somewhat inconsistent on its face, the matter was clarified at the hearing. In response to a question posed by Schmidt, the ALJ explained that the sit/stand option in her second hypothetical question would not require the described individual to remain standing for thirty minutes at a time, but would simply afford him or her the option of temporarily standing every thirty minutes to relieve any type of back pain caused by prolonged sitting. (R. at 48-49). After listening to the ALJ's clarification, Schmidt testified that an individual could productively work as a plastic assembler, garment sorter, surveillance systems monitor or cuff folder from a sitting or standing position. (R. at 48-49). Since the limitations found by the ALJ were adequately conveyed to Schmidt, his testimony satisfied the Commissioner's burden of production at the fifth step of the sequential evaluation process. *Johnson v. Commissioner of Social Security*, 529 F.3d 198, 206 (3d Cir. 2008).

Dr. Abbott opined that Bronson could sit or drive for only two hours, and stand or walk for only one hour, during the course of a typical workday. (R. at 461). Schmidt testified that no jobs existed in the national economy for an individual who was so limited, since he or she would

not be able to complete a full day of work. (R. at 50). Given the existence of Dr. Torio's conflicting assessment, however, the ALJ was not required to credit Dr. Abbott's opinion. *Brown v. Astrue*, 649 F.3d 193, 196-197 (3d Cir. 2011). It was permissible for the ALJ to reject alleged functional limitations that were lacking in evidentiary support. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). As a chiropractor, Dr. Abbott did not qualify as an "acceptable medical source" under the Commissioner's regulations. 20 C.F.R. § 416.913(d)(1)(classifying chiropractors as "other sources"). Under these circumstances, it is axiomatic that the ALJ was entitled to credit Dr. Torio's assessment over that of Dr. Abbott. *Chandler*, 667 F.3d at 361-362 (recognizing the prerogative of an administrative law judge to credit the opinion of a non-examining medical consultant over a conflicting assessment supplied by a treating nurse practitioner). Furthermore, the ALJ "did not merely rubber stamp" Dr. Torio's conclusions. *Id.* at 361. Although the ALJ's residual functional capacity assessment mirrored Dr. Torio's findings in most respects, she added a sit/stand option to account for Bronson's testimony. (R. at 13, 47-49, 361-367). Since the disabling limitations identified by Dr. Abbott were not deemed to be credible, Schmidt's testimony pertaining to an individual with those limitations did not preclude a finding that jobs consistent with Bronson's residual functional capacity existed in the national economy. *Craigie v. Bowen*, 835 F.2d 56, 57-58 (3d Cir. 1987).

Bronson maintains that the ALJ erred in declining to credit the mental limitations identified by Dr. Groves. (Docket No. 9 at 13-15). After conducting a clinical interview lasting for only forty-five minutes, Dr. Groves reported that Bronson was suffering from a panic disorder without agoraphobia and a depressive disorder. (R. at 440, 443). Nevertheless, the mere existence of a medically determinable impairment does not establish the presence of a

functional limitation. *Moore v. Barnhart*, 405 F.3d 1208, 1213, n. 6 (11th Cir. 2005). At the second step of the sequential evaluation process, the ALJ determined that Bronson's mental impairments were "non-severe." (R. at 11-13). Like any other factual finding made by the Commissioner, the ALJ's step-two finding in this case is subject to review under the deferential "substantial evidence" standard. *McCrea*, 370 F.3d at 360-361.

Dr. Groves opined that Bronson would have difficulty working at a regular job on a sustained basis because of "physical back pain." (R. at 445). Bronson's anxiety was deemed to be "secondary to physical pain." (R. at 445). In her brief, Bronson asserts that Dr. Groves qualifies as an "acceptable medical source" under the Commissioner's regulations. (Docket No. 9 at 14). Given the precise nature of Dr. Groves' opinion, however, Bronson's assertion is only half-true. As a licensed psychologist, Dr. Groves was not qualified to assess Bronson's *physical* limitations. 20 C.F.R. § 416.913(a)(2). Since Dr. Groves is not a physician, her statements concerning the limiting effects of Bronson's "physical back pain" did not constitute "medical evidence." *Proper v. Apfel*, 140 F.Supp.2d 478, 483-484 (W.D.Pa. 2001).

As the ALJ pointed out in her decision, Dr. Groves' findings concerning specific functional abilities were inconsistent with her conclusion that Bronson could not work. (R. at 12). Dr. Groves gave Bronson a rating of "fair" or "good" in connection with every functional ability referenced in her examination report. (R. at 448-449). In this respect, Dr. Groves' findings were "internally contradictory." *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). She appears to have based her allegation of disability, at least in part, on Bronson's subjective complaints of *physical* pain. (R. at 445).

In any event, the portions of Dr. Groves' report describing Bronson's functional *abilities* were corroborated by the testimonial record. Bronson testified that she was not receiving formal

psychiatric treatment. (R. at 33). She stated that her primary care physician had provided her with a prescription for Paxil, and that her use of that medication had significantly improved her symptoms. (R. at 33-34). Bronson's testimony was consistent with statements that she had made to Dr. Groves during the course of the clinical interview. (R. at 448). Dr. Groves predicted that Bronson would most likely be able to work if her symptoms continued to improve. (R. at 442). In order to be "severe" under the Commissioner's regulations, an impairment must result in functional limitations that are expected to last for at least twelve months. 20 C.F.R. § 416.922. In her examination report, Dr. Groves stated that Bronson had not suffered a panic attack during the preceding six months. (R. at 443). Just three weeks after the clinical interview, Bronson testified that she had no difficulty getting along with others. (R. at 33). She told the ALJ that she was not interested in pursuing mental health therapy. (R. at 33). Since Bronson had testified that her mental impairments were being controlled with medication prescribed by her primary care physician, the ALJ acted reasonably in concluding that they did not interfere with Bronson's ability to perform basic work activities. (R. at 11-13, 33-34).

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's decision denying Bronson's application for SSI benefits is "supported by substantial evidence." 42 U.S.C. § 405(g). Bronson's motion for summary judgment (*Docket No. 8*) will be denied, and the Commissioner's motion for

summary judgment (*Docket No. 13*) will be granted.  In accordance with the fourth sentence of §

405(g), the Commissioner's "final decision" in this case will be affirmed.


<u>*s/Nora Barry Fischer*</u>
Nora Barry Fischer
United States District Judge

Dated:  September 17, 2013
cc/ecf:  All counsel of record